## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| MILIND DESAI, | ) | Case No. 1:19-cv-2327 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | William H. Baughman Jr. |
| GEICO CASUALTY COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>OPINION AND ORDER</u>

On behalf of himself and those similarly situated, Plaintiff Milind Desai alleges that Defendant Geico Casualty Company failed to pay actual cash value as defined in his auto-insurance policy after an accident rendered the vehicle a total loss. Plaintiff moves for class certification under Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure. Defendant opposes and seeks to exclude the opinions of an expert on which Plaintiff relies to support his motion. For the reasons that follow, the Court **DISMISSES IN PART** Count III for lack of standing, **GRANTS IN PART** Defendant's motion to exclude (ECF No. 121; ECF No. 122), **STRIKES** certain opinions of Defendant's expert, and **DENIES** Plaintiff's motion for class certification (ECF No. 97; ECF No. 105).

### FACTUAL AND PROCEDURAL BACKGROUND

#### A.    Operative Facts Giving Rise to the Litigation

The complaint pleads the following facts, which the parties appear to accept as true, although neither points to factual support in the record for them. Given the

tenor of the proceedings, the Court notes at least one matter in this dispute about which the parties appear not to disagree.

Plaintiff Milind Desai was driving his 2014 Audi A6 Premium Plus Quattro 4D sedan when he was involved in an accident with another motorist.  (ECF No. 1-1, ¶ 33, PageID #26.)  Dr. Desai maintained automobile insurance through Defendant Geico Casualty Company.  After the accident, Geico determined that the Audi was a total loss and offered to pay Dr. Desai $29,039, the amount it determined as the value of the car.  (*Id.*, ¶ 34.)  To arrive at this figure, Geico used a program called CCC One licensed from CCC Information, Inc., to estimate the value of Dr. Desai's car by averaging the adjusted prices of comparable cars.  (*Id.*, ¶ 35.)  Plaintiff alleges that the $29,039 that Geico offered him undervalued his Audi by $161 and excluded an additional $12.88 in sales tax, "$4.50 in title fees, $15.00 in title fees (or interest on the $15.00 title fees, if GEICO delayed the payment)," and Ohio's statutorily established $250 maximum dealer fee.  (*Id.*, ¶ 36, PageID #27.)  In sum, Dr. Desai alleges he is entitled to roughly $450 more than Geico offered him.

Based on these allegations, Plaintiff filed suit seeking a declaratory judgment that Geico's use of CCC One violates Section 3901-1-54(H)(7) of the Ohio Administrative Code (Count I) and alleged that Geico breached the terms of its insurance policy by:  failing to pay license fees (Count II), failing to pay title fees (Count III), failing to pay dealer fees (Count V), and using CCC One (Count IV).  (*Id.*, ¶¶ 55–79, PageID #33–37.)  Plaintiff asserts these claims individually and on behalf

2

of a putative class of other Geico auto-insurance policyholders. (*Id.*, ¶¶ 41–54, PageID #28–33.)

**B.     Relevant Policy Language**

At the heart of the parties' dispute lies the language of the applicable insurance policy.  Geico's Ohio private passenger automotive policies generally provide collision and comprehensive coverage for physical damage resulting in the total loss of an insured's car using the following relevant policy language:

**DEFINITIONS**

> **1. *Actual cash value*** is the replacement cost of the auto or property less ***depreciation*** or ***betterment***.
>
> . . .
>
> **7. *Loss*** means direct and accidental loss of or damage to:
> (a) the auto including its equipment; or
> (b) other insured property.

. . .

**LOSSES WE WILL PAY FOR YOU**

. . .

> ***Collision***
>
> **1.** We will pay for ***collision loss*** to the ***owned*** or ***non-owned auto*** for the amount of each loss less the applicable deductible.

. . .

**LIMIT OF LIABILITY**

The limit of our liability for ***loss***:

> 1. is the ***actual cash value*** of the property at the time of the ***loss***;
>
> . . .
>
> ***Actual cash value*** of property will be determined at the time of the ***loss*** and will include an adjustment for depreciation/betterment and for the physical condition of the property.

. . .

7. PAYMENT OF ***LOSS***

We may at our option:
    (a) pay for the **loss**; or
    (b) repair or replace the damaged or stolen property.

(ECF No. 12-1, PageID #247–50.)  Based on that language, Plaintiff maintains that the policy's definition of "actual cash value" includes tax, title, license, and dealer fees.

### C.  Claims Remaining After the Pleading Stage

### C.1.  Motion to Dismiss

In August 2020, before re-assignment of the case, the Court granted in part and denied in part Defendant's motion to dismiss under Rule 12(b)(6).  In that ruling, the Court determined that Plaintiff's breach of contract claims about Geico's alleged failure to pay title, license, and dealer fees stated a claim for relief.  (ECF No. 49, PageID #644.)  In so ruling, the Court determined that dismissal was inappropriate because the phrase "actual cash value" as it appears in the insurance policy was ambiguous because it did not define "replacement cost" and that Plaintiff's interpretation of the policy was reasonable.  (*Id.*, PageID #646.)

Although the Court allowed Plaintiff's breach of contract claims in Counts II, III, and V to proceed, the Court agreed with Geico that using CCC One did not violate Section 3901-1-54(H)(7) of the Ohio Administrative Code or the policy between Geico and Dr. Desai.  Therefore, the Court dismissed the declaratory judgment claim to the extent it involved that regulation (Count I).  (*Id.*, PageID #646–51.)  Further, the Court determined that Plaintiff has no private cause of action under Section 3901-1-54(H).  (*Id.*, PageID #649–50.)  Accordingly, "all of [Dr. Desai's] claims

and allegations" based on Geico's "alleged violation of Ohio Admin. Code § 3901-1-54-(H) must be dismissed for failure to state a claim." (*Id.*, PageID #650.)

The Court also dismissed Plaintiff's claim that Geico's use of CCC One breached the terms of the policy at issue by incorporating Sections 3901-1-54-(H)(2) and (H)(7) of the Ohio Administrative Code (Count IV). (*Id.*, PageID #650–51.) "Given the fact that the court has already determined that Geico's use of the CCC System does not violate Ohio Admin. Code § 3901-1-54(H)(7)(a), even if the provision is incorporated into the Policy such that it has independent legal force under the policy, [Dr. Desai's] claim would fail." (*Id.*, PageID #651.) Simply put, "[Geico's] use of the CCC System does not violate the Policy." (*Id.*)

### C.2.   Leave to Amend

Plaintiff sought leave to amend, seeking to make several changes to the complaint, some substantive, others technical. (ECF No. 50.) Specifically, Plaintiff sought to:  (1) assert a claim that Geico breached its contract by failing to pay him sales tax, (2) omit the CCC One claims the Court dismissed, (3) fix an incorrect statutory reference, (4) designate an alternative damages calculation, and (5) "make certain clarifications, edits, and updates in light of the Court's Order." (*Id.*, PageID #652.) Because the motion came after the deadline for amendments set at the Rule 16 conference, the Court found that good cause did not support the addition of a breach of contract claim relating to the failure to pay sales tax. (ECF No. 62, PageID #794.) Geico did not oppose amendment to make the other proposed changes, and the Court granted Plaintiff's motion to do so. (*Id.*, PageID #795–96.)

5

Following that ruling, Plaintiff again attempted to amend (ECF No. 65), but Defendant objected that Plaintiff's proposed amendment did not comply with the terms of the amendment the Court permitted (ECF No. 68).  Upon review of the proposed amendment, the Court agreed with Defendant, finding that "there is not good cause to permit amendment at this point," given the imminent close of discovery and Plaintiff's failure to comply with the Court's ruling on amendment.  (Order, Mar. 16, 2021.)

### C.3.  Reconsideration / Motion for Judgment on the Pleadings

After re-assignment of this case, Defendant moved for judgment on the pleadings on all of Plaintiff's surviving claims, essentially seeking reconsideration of the prior ruling on the motion to dismiss.  (ECF No. 74.)  Both procedurally and on the merits, the Court denied the motion.  (*See generally* ECF No. 84.)  Therefore, at this point in the litigation, Plaintiff's remaining claims include a request for declaratory judgment (Count I) that Geico breached its insurance contract with Dr. Desai by failing to pay license fees (Count II), title fees (Count III), and dealer fees (Count V).  (ECF No. 1-1, ¶¶ 55–73, 77–79, PageID #33–37; ECF No. 49, PageID #651; ECF No. 84, PageID #1550.)

### D.  Facts Relating to Class Certification

Plaintiff seeks certification of the following class:

All individuals who:  (a) on or after September 6, 2011; (b) are or were covered by a GEICO CASUALTY COMPA[N]Y ("GEICO") Ohio personal automobile insurance policy; (c) made a claim under the Collision or Comprehensive coverages of that policy for damage or loss to a covered vehicle which GEICO accepted and treated as a total loss claim; and (d) GEICO paid the claim on a cash settlement basis.  The class period

will be from September 6, 2011, to the date of class certification (hereinafter the "Class Period").

(ECF No. 97, PageID #2131; ECF No. 105, PageID #2302.)  On the procedural history of the case, Plaintiff seeks to certify this class to pursue claims based on Geico's alleged failure to pay title, license, and dealer fees as its insurance policy promised.

The record makes certain relevant facts clear.  For example, the Court finds that, during the proposed class period, the applicable policy language at issue did not change. (ECF No. 96-1, PageID #1665; *id.*, PageID #1671–72; ECF No. 105-1, PageID #2335; *id.*, PageID #2341–42.)  In fact, it predates the class period by nearly two years. (ECF No. 96-1, PageID #1665; ECF No. 105-1, PageID #2335.)  Further, from the beginning of the class period (September 6, 2011) to November 30, 2019, the license fee was $4.50, and on December 1, 2019 it increased to $6.00.  (ECF No. 96-3, PageID #1781; *id.*, ¶ 14, PageID #1806; ECF No. 105-3, PageID #2451; *id.*, ¶ 14, PageID #2476.)  Throughout the class period, the title fee has remained $15.00.  (ECF No. 96-3, PageID #1781; *id.*, ¶ 14, PageID #1807; ECF No. 105-3, PageID #2451; *id.*, ¶ 14, PageID #2477.)  Under Ohio law, dealers may charge a documentary service charge not to exceed the lesser of $250 or 10% of the amount the buyer is required to pay, excluding tax, title, and license fees.  *See* Ohio Rev. Code §§ 1317.07 & 4517.261.

Geico does not pay fees on either a reimbursement basis or upfront, though it might have paid that fee to some policyholders inadvertently.  (ECF No. 96-1, PageID #1763–74; ECF No. 105-1, PageID #2433–44.)  Until late summer 2020, Geico reimbursed total losses after the insured provided proof of purchase of a replacement vehicle.  (ECF No. 96-2, PageID #1726; ECF No. 105-2, PageID #2396 *see also* ECF

7

No. 96-3, ¶ 15, PageID #1807; ECF No. 96-4, PageID #1869; ECF No. 105-3, ¶ 15, PageID #2477; ECF 105-4, PageID #2537.)  Notwithstanding this practice, some Geico adjusters paid title fees on a reimbursement basis, but not license fees— meaning that license fees were paid upfront without documentation that a policyholder incurred the fee.  (ECF No. 96-3, ¶ 15, PageID #1807; ECF No. 105-3, ¶ 15, PageID #2477.)  Later, Geico paid title and license fees upfront.  (ECF No. 96-2, PageID #1726; ECF No. 96-3, ¶ 15, PageID #1807; ECF No. 96-4, PageID #1869; ECF No. 105-2, PageID #2396; ECF No. 105-3, ¶ 15, PageID #2477; ECF 105-4, PageID #2537.)  Plaintiff argues that this change in practice represents a concession that its policies require payment of the fees at issue.  (ECF No. 97, PageID #2135; ECF No. 105, PageID #2306.)  Whether the change represents a concession, it does not affect the propriety of class certification—except, perhaps, to the extent that identifying the proper amounts due and owing, assuming a liability finding, bears on the Rule 23 inquiry.

### D.1.  Plaintiff's Expert

Plaintiff proffers "proof common to all Class Members or groups of them that they were reasonably likely to purchase from dealers."  (ECF No. 97, PageID #2136; ECF No. 105, PageID #2307.)  That proof consists of a statistical study of dealer fees and analysis of publicly available data regarding auto purchases as applied to the putative class members based on data from Geico.  (ECF No. 97, PageID #2136; ECF No. 105, PageID #2307)  This expert evidence comes from Edward Stockton, the Vice President and Director of Economics Services of The Fontana Group, Inc., a consulting firm in Arizona that provides economic consulting and expert testimony

regarding the retail motor-vehicle industry, among others.  (ECF No. 96-3, ¶ 1, PageID #1735; ECF No. 105-3, ¶ 1, PageID #2405.)

Stockton opines that class members can be identified; Geico's practices for reimbursement of title and license fees and non-payment of dealer fees apply on a class-wide basis; those policies (assuming the legal merit of Plaintiff's position) result in economic harm to class members; feasible economic models can quantify on a class-wide basis "some, or all, of the economic harm" class members suffered; and "[r]easonable and feasible methods exist to estimate the overall amount of past payments that GEICO has reimbursed for title/license fees and to identify which Class members received them and in what amounts."  (ECF No. 96-3., ¶¶ 19–24, PageID #1743–45; ECF No. 105-3, ¶¶ 19–24, PageID #2413–15.)  With respect to the economic models Stockton references, they "would calculate the title/license fees payable," deducting "[i]f necessary," those that Geico already paid.  (ECF No. 96-3, ¶ 22, PageID #1744; ECF No. 105-3, ¶ 22, PageID #2414.)  Further, the models "would tabulate *reasonably anticipated* dealer documentary fees."  (ECF No. 96-3, ¶ 22, PageID #1744; ECF No. 105-3, ¶ 22, PageID #2414 (emphasis added).)

To formulate these opinions, Stockton assessed "the frequency with which GEICO total loss insureds are likely to incur dealer documentary fees if they purchase replacement vehicles" based on data of vehicle sales and registrations from IHS Automotive and a dealership survey he conducted, in addition to Geico's claims file and other litigation materials.  (ECF No. 96-3, ¶ 15, PageID #1742; ECF No. 105-3, ¶ 15, PageID #2412.)  To determine the typical amount of dealer fees such

individuals pay, Stockton used information from Edwards and a survey of Ohio dealerships that blended publicly available information and direct contact with dealerships.  (ECF No. 96-3, ¶¶ 16, 17, PageID #1742–43; ECF No. 105-3, ¶¶ 16, 17, PageID #2412–13.)

Based on this information, Stockton formed two conclusions.  First, "the overwhelmingly prevalent documentary fee charged in Ohio is $250"—the statutory maximum.  (ECF No. 96-3, ¶ 32, PageID #1748; ECF No. 105-3, ¶ 32, PageID #2418.) (Some 3,500 class members paid a dealer fee less than $250 because of Ohio's cap of 10% of the vehicle's cost, and Stockton states how to identify these class members and calculate the fee each paid.  (ECF No. 96-3, ¶ 34, PageID #1749 n.15; ECF No. 105-3, ¶ 34, PageID #2419 n.15.)  Second, the median fee that mid-sized dealerships in Ohio charge is $240.46, which accounts for those that do not report charging a fee. (ECF No. 96-3, ¶ 34, PageID #1749; ECF No. 105-3, ¶ 34, PageID #2419.)  Stockton uses IHS Automotive data "to determine the propensity for consumers to acquire used vehicles from dealerships as opposed to private parties and other sources."  (ECF No. 96-3, ¶ 36, PageID #1750; ECF No. 105-3, ¶ 36, PageID #2420.)  Based on his analysis, approximately 60% of owners of total-loss vehicles purchase a replacement from a dealership.  (ECF No. 96-3, ¶ 38, PageID #1751; ECF No. 105-3, ¶ 38, PageID #2421.)

With respect to title and license fees, Stockton calculates that class members should have received approximately $485,000 between September 6, 2011 and the time when Geico changed its reimbursement practices.  He bases his calculation on

just under 25,000 total claims and *not* accounting for title and license fees that Geico actually paid on a reimbursement basis or otherwise.  (ECF No. 96-3, ¶ 27, PageID #1746;  ECF No. 105-3, ¶ 27, PageID #2416.)   He also proposes a method for determining interest on title and license fees paid on a reimbursement basis to account for any delay between the date on which payment was due and actually paid.  (ECF No. 96-3, ¶ 41, PageID #1752; ECF No. 105-3, ¶ 41, PageID #2422.)

### D.2.  Defendant's Evidence

Defendant presents evidence that Geico individually negotiates and settles each claim based on its particular facts and circumstances.  (ECF No. 116-1, ¶¶ 6, 7, PageID #3017;  ECF No. 115-1, ¶¶ 6, 7, PageID #2909.)  In particular, Defendant's evidence shows that Geico individually determines the actual cash value it pays a policyholder following a claim for a total loss.  (ECF No. 116-1., ¶¶ 4, 8, 9, PageID #3016, 3018;  ECF No. 115-1, ¶¶ 4, 8, 9, PageID #2908, 2910.)

Defendant also relies on the deposition testimony of Plaintiff's expert. Specifically, Stockton acknowledged that consumers can negotiate lower dealer fees. (ECF No. 122, PageID #3143;  ECF No. 121, PageID #3116.)  Defendant uses this concession to contest Stockton's opinion that his model identifies the dealer fees owed to putative class members.

Further, to rebut Plaintiff's argument that, whatever the amount of a settlement for any particular class member, Geico underpaid by a readily determinable amount attributable to the fees at issue, Defendant presents an expert of its own:  Jonathan Tomlin, Ph.D., an economist at Ankura Consulting.  (ECF

No. 96-3, PageID #1802; ECF No. 105-3, PageID #2472.)  He offers four opinions to counter those of Stockton.

First, Tomlin opines that, "[f]or many of the putative class members," settlement of a total-loss claim exceeds actual cash value, however measured, even "after adding license fees, title fees, and dealer fees." (ECF No. 96-3, ¶ 7(a), PageID #1804; *id.*, ¶ 25, PageID #1810; ECF No. 105-3, ¶ 7(a), PageID #2474; *id.*, ¶ 25, PageID #2480.)  For this reason, determining whether Geico has liability to any putative class members presents a highly individualized inquiry based on the particular vehicle, sources of its valuation, and amount Geico ultimately paid.  (ECF No 96-3, ¶ 25, PageID #1811; ECF No. 105-3, ¶ 25, PageID #2481.)  To illustrate the point, Tomlin states that he examined a random sample from potential class members using different sources to determine the valuation of their vehicles and observed that substantial numbers of potential class members received a settlement that exceeded their vehicle's value plus license, title, and dealer fees.  (ECF No 96-3, Table 5, PageID #1824; ECF No. 105-3, Table 5, PageID #2494.)  Tomlin also reports the amount of time this process took him and his staff using different valuation sources.  (ECF No 96-3, ¶ 45, PageID #1821; ECF No. 105-3, ¶ 45, PageID #2491.)

Second, Tomlin challenges the methodology Stockton used in his survey to determine dealer fees, the amount of which, in Tomlin's opinion, "cannot be determined on a classwide basis because it depends on the individual circumstances of that putative class member."  (ECF No. 96-3, ¶ 7(b), PageID #1804; ECF No. 105-3, ¶ 7(b), PageID #2474; *see also* ECF No. 96-3, ¶¶ 85–95, PageID #1838–42; ECF

No. 105-3, ¶¶ 85–95, PageID #2508–12.)  He notes that Stockton's "own data shows that approximately 40% of used vehicle buyers in Ohio do not buy from dealers (and, therefore, presumably did not pay any dealer fee)."  (ECF No. 96-3, ¶ 62, PageID #1830; ECF No. 105-3, ¶ 62, PageID #2500.)  Further, Tomlin opines that many consumers negotiate reductions or waivers of dealer fees.  (ECF No. 96-3, ¶¶ 76–80, PageID #1835–36; ECF No. 105-3, ¶¶ 76–80, PageID #2505–06.)

Third, Tomlin attacks Stockton's damages calculation to the extent that it includes a method for calculating any interest due on the delay in payment of license and title fees.  (ECF No. 96-3, ¶ 7(c), PageID #1804; *id.* ¶¶ 99–101, PageID #1843–44; ECF No. 105-3, ¶ 7(c), PageID #2474; *id.* ¶¶ 99–101, PageID #2513–14.)

Fourth, Tomlin attacks the factual predicate for Stockton's view that the data Geico produced allows identification of fees actually paid.  (ECF No. 96-3, ¶ 7(d), PageID #1805; *id.*, ¶ 97, PageID #1843; ECF No. 105-3, ¶ 7(d), PageID #2475; *id.*, ¶ 97, PageID #2513.)  In this regard, he points out that Stockton does not actually perform the analysis he outlines for determining the fees Geico paid.  (ECF No. 96-3, ¶ 18, PageID #1808; ECF No. 105-3, ¶ 18, PageID #2478.)

## JURISDICTION

Arguing that the putative class members suffered no injury, Defendant attacks Plaintiff's standing.  (ECF No. 118, PageID #3085–86; ECF No. 117, PageID #3056–57.)  Standing presents a "threshold determinant[] of the propriety of judicial intervention."  *Warth v. Seldin*, 422 U.S. 490, 517–18 (1975).  "[A]t an irreducible minimum, Article III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the

putatively illegal conduct of the defendant" and that "the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 542 (1986) (cleaned up). "A plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Kanuszewski v. Mich.*, 927 F.3d 396, 406 (6th Cir. 2019) (quoting *Town of Chester v. Laroe Estates, Inc.*, 137 S.Ct. 1645, 1650 (2017)).

These requirements hold true for class representatives. "Plaintiffs are not absolved of their individual obligation to satisfy the injury element of Article III just because they allege class claims." *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 582 (6th Cir. 2016). A class representative must demonstrate "individual standing vis-a-vis the defendant; he cannot acquire such standing merely by virtue of bringing a class action." *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998). Because "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not," each class member must have standing. *TransUnion*, 141 S. Ct. at 2208 (quoting *Tyson Foods, Inc.* v. *Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C. J., concurring)).

Defendant maintains that "mere violation of a statute or a contract without an accompanying injury does not constitute an injury in fact." (ECF No. 118, PageID #3085; ECF No. 117, PageID #3056 (citing *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021)).) Defendant goes on to characterize Plaintiff's underlying claims as a "technical violation" of the policy. (ECF No. 118, PageID #3086; ECF No. 117, PageID #3057.) But Plaintiff does not allege a technical violation of his insurance

14

policy with Geico. Indeed, he asserts that Geico breached the parties' contract by failing to pay him according to its terms. That claimed breach, if proved, constitutes monetary harm, an underpayment—an injury in fact that is concrete, particularized, and actual. *See TransUnion*, 141 S. Ct. at 2203. Indeed, Plaintiff sufficiently places these amounts into dispute by claiming that Geico undervalued his vehicle by not paying "an additional $12.88 of applicable sales tax . . . , $4.50 in title fees, $15.00 in title fees (or interest on the $15.00 title fees, if GEICO delayed the payment), and the amount of the most frequently charged dealer fees in Ohio, most likely the statutory maximum of $250." (ECF No. 1-1, ¶ 36, PageID #27.) Plaintiff's alleged injury is fairly traceable to Geico's conduct as Dr. Desai's insurer, and a favorable decision for Plaintiff will redress that injury.

Beyond that, Defendant argues that "Plaintiff's failure to demonstrate how he can answer this central contention [of showing the fees owed to an individual class member] with common proof also implicates standing issues." (ECF No. 118, PageID #3094 n.7; ECF No. 117, PageID #3065 n.7.) Defendant fails to explain what standing implications arise from this Rule 23 inquiry. Nor does Defendant's citation of *In re Carpenter*, No. 14-0302, 2014 WL 12809636, at *2 (6th Cir. 2014), add much clarity. There, the Sixth Circuit declined interlocutory review of an order denying class certification. In doing so, the court stated as one reason: "Assuming that the Petitioners preserved their standing argument before the district court, whether standing is established is dependent upon whether the definition of the class is sufficiently narrow to exclude uninjured parties." *Id.* Because Article III standing is

15

jurisdictional and requires decision before other issues, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998), it is unclear whether this passage relates instead to antitrust standing—a different legal concept.  Assuming it does not, Plaintiff's injury in fact raises all the usual arguments about the propriety of class certification, not a threshold standing issue.  *See TransUnion*, 141 S. Ct. at 2208 n.4 ("We do not here address the distinct question whether every class member must demonstrate standing *before* a court certifies a class.") (citation omitted); *see also Angell v. GEICO Advantage Ins. Co.*, No. 4:20-cv-799, 2021 WL 5585732, at *2 (S.D. Tex. Nov. 30, 2021).

*     *     *

Because of the limited jurisdiction of the federal courts, the Court has an independent obligation to examine its own jurisdiction to ensure it has the authority to proceed.  *See, e.g.*, *Nikolao v. Lyon*, 875 F.3d 310, 315 (6th Cir. 2017) (citations and quotations omitted).  Based on review of the record and the parties' respective arguments, the Court determines that Plaintiff lacks standing to recover title fees on behalf of himself (and, by extension, the class).  Plaintiff agrees that Geico already reimbursed Dr. Desai $15 for the title fee.  (ECF No. 97, PageID #2141; ECF No. 105, PageID #2312.)  Thorough review of his artful and careful pleading confirms as much.  (ECF No. 1-1, ¶ 36, PageID #27.)  Therefore, he is not injured and may not pursue that claim.  To the extent Count III involves a claim for breach of contract related to title fees, the Court **DISMISSES** Plaintiff's claim for title fees for lack of jurisdiction.

However, as part of his claim in Count III for breach of contract based on title fees, Plaintiff seeks the interest accrued on the title fee from its allegedly delayed

16

payment.  (ECF No. 1-1, ¶ 73, PageID #36; *see also id.* ¶ 36, PageID #27.)  Ohio law gives a person a right to interest on money when it becomes due and payable on any contract.  Specifically, Section 1343.03(A) of the Ohio Revised Code provides: "when money becomes due and payable upon any . . . instrument of writing . . . , the creditor is entitled to interest" at a specified rate.  Under this statute, "interest is compensation to the plaintiff for the period of time between accrual of the claim and judgment." *J-Way Leasing, Ltd. v. American Bridge Co.*, No. 1:07 CV 3031, 2010 WL 703077, at *1 (N.D. Ohio Feb. 23, 2010) (citing *Royal Elec. Constr. Corp. v. Ohio State Univ.*, 73 Ohio St.3d 110, 117, 652 N.E.2d 687 (1995)).  For this reason, although Dr. Desai lacks standing to pursue his claim for title fees, Ohio law gives him a cause of action for interest on any delayed payment of that fee.  Though for a nominal sum, that amount constitutes an injury that Plaintiff may pursue.

Accordingly, Plaintiff has standing to sue for dealer and license fees and interest on late-paid title fees.  Because the Court concludes that Plaintiff lacks standing to pursue a claim for the title fees at issue, for the sake of brevity, when the Court refers in the balance of this ruling to title fees, the Court means interest arising from delayed payment of title fees.

## ANALYSIS

Due process protects an individual's right "to have his own day in court" and affords litigants the right to participate in and control lawsuits affecting their interests.  *See, e.g.*, *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846–47 (1999) (citations omitted); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428–29 (1982).  A class action is "an exception to the usual rule that litigation is conducted by and on behalf

17

of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979).  Because it binds absent class members to judgments in actions in which they did not participate, and about which they may not even be aware, representative litigation violates due process unless the person seeking to proceed on behalf of a class demonstrates compliance with all the requirements of Rule 23.  *See, e.g.*, *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)); *Hansberry v. Lee*, 311 U.S. 32, 42 (1940).

Formerly, a court was foreclosed from inquiry into the merits of the case at the class-certification stage.  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974).  However, "[r]ecent Supreme Court precedent clearly holds that 'plaintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Rikos v. P&G*, 799 F.3d 497, 527–28 (6th Cir. 2015) (Cook, J., dissenting) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014)).  Under this more recent authority, a court may certify a class only where the plaintiff presents "evidentiary proof" sufficient to withstand "rigorous analysis" under Rule 23.  *Comcast*, 569 U.S. at 33.  Rule 23's "rigorous analysis" more often than not "will entail some overlap with the merits of the plaintiff's underlying claim." *Dukes*, 564 U.S. at 350–51.

In short, the Supreme Court now recognizes that the merits may be considered under Rule 23 to the extent relevant to determine whether the prerequisites for class certification are satisfied.  *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013).  A district court may not conduct "free-ranging merits inquiries

at the certification stage." *Id.* But Rule 23 is not a pleading standard, and determining whether the plaintiffs have carried their burden at class certification "generally involves considerations that are enmeshed in the factual and legal issues comprising the[ir] cause of action." *Dukes*, 564 U.S. at 351 (quoting *General Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978))).

## I.    *Daubert* Motion

Before turning to the rigorous analysis that Rule 23 demands, the Court first addresses Defendant's motion to exclude the opinions of Plaintiff's expert.  (ECF No. 122; ECF No. 121.)

### I.A.    Application of Rule 702 on a Motion Under Rule 23

As a threshold matter, whether Rule 702 applies to evidence presented on a motion for class certification remains an unsettled question.

#### I.A.1. Supreme Court Decisions

In discussing methods for establishing commonality and typicality under Rule 23(a), the Supreme Court in *Wal-Mart v. Dukes* addressed the conceptual gap between an individual's claim of unlawful discrimination and the existence of a class of persons who suffered the same injury.  564 U.S. at 353.  In the district court in that case, the plaintiffs presented the opinions of an expert sociologist to bridge that gap. Based on the expert's testimony that he could not determine whether virtually all or virtually none of the defendant's employment decisions resulted from legally improper or suspect considerations, the parties disputed whether that evidence met the standard for expert testimony under Rule 702.  The district court determined that

Rule 702 does not apply at the class-certification stage.  Although the Supreme Court declined to decide that question, it responded to the district court's view by stating, flatly, "We doubt that is so."  *Id.* at 354.  Instead of answering that question, the Court assumed the expert satisfied Rule 702, but determined that his inability to quantify the scope of allegedly improper decision-making fell short of the type of significant proof required to establish commonality and typicality.  *Id.* at 354–55.

In *Comcast Corp. v. Behrend*, 567 U.S. 933, 933 (2012) (mem.), the Supreme Court granted *certiorari* on the following question:  "[w]hether a district court may certify a class action without resolving whether the plaintiff class has introduced admissible evidence, including expert testimony, to show that the case is susceptible to awarding damages on a class-wide basis."  Because the defendant had not preserved for review the admissibility of the plaintiffs' proffered expert testimony, the Supreme Court instead addressed whether the evidence at class certification satisfied the standard for predominance under Rule 23(b)(3).  *Comcast*, 569 U.S. at 33 n.4.  Since then, the Supreme Court has not revisited the issue.

### I.A.2. The Law of This Circuit

The Sixth Circuit has not definitively addressed this issue either.  In *Hicks v. State Farm Fire & Casualty Co.*, 965 F.3d 452, 465 (6th Cir. 2020), the court noted the issue and stated that the Circuit has "yet to settle this matter."  That case did not present the issue because the district court did not rely on expert evidence in ruling on class certification.  *Id.*  Previously, the Sixth Circuit spoke to the issue in denying petitions for interlocutory review of class certification orders under Rule 23(f).  *See In re Kondash*, No. 20-0304, 2021 U.S. App. LEXIS 7259, at *3 (6th Cir. Mar. 11, 2021)

(recognizing that requirement for full *Daubert* analysis on class certifications remains an open question in the Circuit); *In re Carpenter Co.*, No. 14-0302, 2014 U.S. App. LEXIS 24707, at *10, 2014 WL 12809636, at *3 (6th Cir. Sept. 29, 2014) (denying Rule 23(f) petition because no abuse of discretion occurred where district court applied *Daubert* at the class-certification stage).

Recently, the Sixth Circuit expounded on the related question of whether admissible evidence must support class certification.  In *Lyngaas v. Curaden AG*, 992 F.3d 412 (6th Cir. 2021), at the conclusion of discovery in the district court, the plaintiff moved for summary judgment and to certify a class based on violations of the Telephone Consumer Protection Act.  In opposition, the defendants argued, among other things, that the plaintiff failed to support the class-certification motion with admissible evidence.  Finding that summary reports of the faxes at issue, though not authenticated, satisfied Rule 23's predominance and ascertainability requirements, the district court granted class certification.  Then, the district court held a two-day bench trial.  Based on the evidence at trial, the district court found that the plaintiff failed to prove the total number of faxes sent to the class because the plaintiff did not properly authenticate the summary reports and because the testimony of the plaintiff's expert was inadmissible and unpersuasive.  As a result, the district court established a claims-administration process for class members to verify receipt of faxes.

On appeal of the class-certification ruling, the defendants argued that the district court abused its discretion by relying on inadmissible evidence to certify a

class and establish the claims-administration process. In reviewing this issue, the Sixth Circuit analyzed the evidentiary rules and standards that apply to a motion for class certification, and this portion of the opinion was unanimous (a dissent addressed issues of personal jurisdiction in class actions not relevant here). *See id.* at 427–30; *id.* at 438–46 (Thapar, J.) (dissenting in part). Noting that the Sixth Circuit "has never required a district court to decide conclusively at the class-certification stage what evidence will ultimately be admissible at trial," *id.* at 428, the *Lyngaas* Court read the Supreme Court's precedents requiring rigorous analysis and evidentiary proof *not* to require admissible evidence, "at least with respect to nonexpert evidence," *id.* at 428–29 (citations omitted).

In reaching this conclusion, the Sixth Circuit agreed with the Eighth and Ninth Circuits that the differences between summary judgment and class certification "warrant greater evidentiary freedom at the class certification stage." *Id.* at 429 (quoting *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1005 (9th Cir. 2018)); *see also In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 614 (8th Cir. 2011). Further, a class-certification ruling is inherently tentative and subject to amendment before trial. Fed. R. Civ. P. 23(c)(1)(C); *see also Coopers & Lybrand*, 437 U.S. at 469 n.11. Therefore, the court reasoned that it makes little sense to apply formal trial rules and procedures at the certification stage. *Lyngaas*, 992 F.3d at 429 (citations omitted).

Based on these principles, the Sixth Circuit rejected the defendants' argument, but noted with approval cases considering reliable evidence at class certification, even

if it later proves inadmissible.  *Id.* at 429 (citations omitted).  It also cited with approval a district court that "consider[ed] all the evidence presented in support of and in opposition to class certification, and grant[ed] to the evidence the weight that the Court [found was] most appropriate."  *Id.* (quotation omitted).

### I.A.3. Other Circuits

Although the Sixth Circuit has not directly spoken to the issue, even noting that its decision in *Lyngaas* may not apply to expert evidence, a Circuit split has emerged on the issue.  A majority of the Circuits that have considered the question hold that on a motion for class certification expert evidence must comply with Rule 702.  *See In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015); *Prantil v. Arkema Inc.*, 986 F.3d 570, 574–76 (5th Cir. 2021); *American Honda Motor Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010); *Sher v. Raytheon Co.*, 419 F. App'x 887, 890–91 (11th Cir. 2011).  Two others endorse a "tailored *Daubert* analysis" under which a district court "examine[s] the reliability of the expert opinions in light of the available evidence and the purpose for which they [a]re offered" and "with Rule 23's requirements in mind."  *In re Zurn Pex Prods. Liab. Litig.*, 664 F.3d at 612; *see also Sali*, 909 F.3d at 1006 ("We find the Eighth Circuit's analysis persuasive.").

Notwithstanding these facially competing approaches, there is less distance between them (and the approach the Sixth Circuit outlined in *Lyngaas*) than meets the eye.  For example, courts and commentators generally regard the Seventh Circuit as having staked out the most demanding requirement that Rule 702 applies on a motion for class certification.  But its approach requires a district court to rule on challenges to an expert's qualifications and methodology only where "an expert's

report or testimony is critical to class certification." *American Honda*, 600 F.3d at 815; *see also In re Blood Reagents Antitrust Litig.*, 783 F.3d at 187 (same); *Sher*, 419 F. App'x at 890.  A matter "critical to class certification" means "important to an issue decisive for the motion for class certification." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012).  Similarly, the Fifth Circuit requires analysis under Rule 702 "when scientific evidence is relevant to the decision to certify." *Prantil*, 986 F.3d at 575.  With that qualification, the Eighth and Ninth Circuit's tailored approach, which the Sixth Circuit followed in *Lyngaas* with respect to nonexpert evidence, differs perhaps more in form than in substance.

### I.A.4. The Court's Approach to Rule 702 at Class Certification

Rather than wade into the fray, Defendant assumes the problem away.  It argues that "Plaintiff concedes that the Court must determine admissibility of Stockton's opinions at class certification." (ECF No. 122, PageID #3140; ECF No. 121, PageID #3113.)  But Plaintiff does no such thing.  All Plaintiff says, when arguing that he meets the predominance requirement of Rule 23(b)(3), is that "unless the Court finds Stockton's testimony based on this model [for determining propensity to purchase from a dealer] inadmissible (an extremely unlikely outcome), predominance is satisfied." (ECF No. 97, PageID #2145; ECF No. 105, PageID #2316.)  And in opposition to Defendant's motion to exclude, Plaintiff defends the reliability and admissibility of Stockton's opinions without taking an explicit position on whether Rule 702 applies.  (*See* ECF No. 127, PageID #3270, 3273; ECF No. 126, PageID #3188.)

24

In the absence of controlling authority on the issue, the Court begins its analysis with the text of the rules that govern class certification. The Federal Rules of Evidence "apply to proceedings in United States courts." Fed. R. Evid. 101(a). They apply to proceedings in district courts, Fed. R. Evid. 1101(a), "in civil cases and proceedings," Fed. R. Evid. 1101(b), except to "the court's determination, under Rule 104(a), on a preliminary question of fact governing admissibility," Fed. R. Evid. 1101(d). Rule 104(a) provides that a "court must decide any preliminary question about whether a witness is qualified . . . or evidence is admissible. In so deciding, the court is not bound by evidence rules[.]" On their face, the Federal Rules of Evidence apply to civil proceedings, except to the extent necessary to determine the qualifications of a witness or the admissibility of evidence. In making that determination, a court may consider otherwise inadmissible evidence—a different matter than saying an expert need not meet the requirements of Rule 702 when offering opinions bearing on the decision to certify a class. To the contrary, the Rules of Evidence suggest that they apply to all other evidentiary proceedings. Nothing in Rule 23 or Rules 701 through 706 says otherwise.

Against that textual background, and the Supreme Court's statement that it doubts that Rule 702 does not apply to class certification, *Dukes*, 564 U.S. at 354, the Court concludes that Rule 702 applies to class certification. This conclusion advances the rigorous analysis that Rule 23 demands to ensure expert evidence rests on reliable methods reliably applied before setting in motion the machinery of the class device. Plaintiff responds that such determinations go to the weight that an expert's

25

opinions receive on class certification, not their admissibility (so to speak). But unreliable opinions are entitled to *no* weight, and the parties are entitled to know whether a court finds that expert evidence meets the bar Rule 702 sets. Although the Sixth Circuit has not directly opined on the issue, *Lyngaas*, 992 F.3d at 428–29, it recognizes that a district court does not abuse its discretion by applying Rule 702 on a motion for class certification. *In re Carpenter*, 2014 U.S. App. LEXIS 24707, at *10, 2014 WL 12809636, at *3.

The Court's determination that Rule 702 applies on Plaintiff's motion for class certification leaves three additional matters for the Court to address briefly.

### I.A.4.a. Helpful to the Trier of Fact

Necessarily, the interplay between the standard that governs a motion for class certification under Rule 23 affects how Rule 702 applies on such a motion. Rule 702 provides, in relevant part, that an expert "may testify in the form of an opinion or otherwise" where the expert's testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). On a motion for class certification, however, there is no trier of fact except to the extent the district court must resolve factual issues or disputes in rigorously analyzing whether Plaintiff offers sufficient evidentiary proof to show that the due-process requirements that Rule 23 demands are satisfied.

But a motion for class certification does not permit "free-ranging merits inquiries at the certification stage." *Amgen*, 568 U.S. at 466. In this respect, the approach of the Circuits that have considered the issue appropriately balances the requirements of Rule 702 with the governing standard under Rule 23—whether

26

requiring a full analysis under Rule 702 where an expert's opinions are critical to class certification or taking a more tailored approach.  Put more simply, rigorous analysis demands opinions derived from qualified experts reliably derived from reliable principles and methods reliably applied.  And the expert's opinions must support certification under Rule 23.

### I.A.4.b. Independent Obligation

Rule 702 "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).  At bottom, this gatekeeping function ensures that expert evidence rests on a reliable foundation and is relevant to the task at hand.  *Daubert*, 509 U.S. at 589, 597.  Although Rule 702 lists four prerequisites for expert testimony, the Supreme Court holds that the inquiry into reliability is ultimately flexible. *Kumho Tire*, 526 U.S. at 141.  A district court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable," including "discretionary authority . . . to avoid unnecessary 'reliability' proceedings" in appropriate cases.  *Id.* at 152.  To fulfill its gatekeeping role, the Court subjects the opinions of Stockton, which Defendant moves to exclude, as well as those of Tomlin, which Plaintiff does not, to scrutiny under Rule 702.

### I.A.4.c. Evidentiary Hearing

In opposing class certification, Defendant requested an evidentiary hearing to resolve various disputes of fact (ECF No. 118, PageID #3071; ECF No. 117, PageID #3042) and reiterated this request at oral argument.  Whether to hold a hearing under

Rule 702 rests within the sound discretion of the district court. *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 249 (6th Cir. 2001); *Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000). The Supreme Court made as much clear:

> The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable.

*Kumho Tire,* 526 U.S. at 152. Similarly, the Court has discretion to conduct an evidentiary hearing on a motion for class certification. *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 251–52 (2d Cir. 2011) (quotation omitted); *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1099 (11th Cir. 1996).

Based on the record before the Court and the parties' respective arguments, the Court declines to exercise its discretion to hold a hearing. Considering the reports of the experts that each side proffered, the supporting materials on which each relies, and the deposition testimony presented, the Court sees only marginal value at best in further development of the expert record. Whatever minimal value there might be is outweighed by the added cost and delay associated with a formal hearing. Similarly, in the Court's view the parties have had ample opportunity to develop a record regarding class certification, obviating the need for evidentiary proceedings. Indeed, close review of Defendant's arguments claiming disputes of fact amount to little more than desiring an opportunity to cross examine Plaintiff's witnesses—an opportunity it has already had in discovery. Accordingly, the Court declines to hold an evidentiary hearing on Plaintiff's motion.

28

### I.B.    Analysis of the Opinions of Stockton and Tomlin

With all this in mind, the Court applies Rule 702 to each party's expert opinions before it addresses Plaintiff's motion for class certification.  Before offering opinion testimony, Rule 702 requires that the witness be "qualified as an expert by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  Additionally, the Court must find that:  (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (b) "the testimony is based on sufficient facts or data"; (c) "the testimony is the product of reliable principles and methods"; and (d) "the expert has reliably applied the principles and methods to the facts of the case."  *Id.*  The relevancy prong of analysis under Rule 702 requires that an expert's opinions "fit" the facts of the case.  *Daubert*, 509 U.S. at 591.

As mentioned above, this inquiry is flexible.  *Kumho Tire*, 526 U.S. at 141.  Beyond the formal requirements, one consideration courts factor into the analysis is whether the expert formed his opinions for purposes of the litigation or whether, instead, they are a natural outgrowth of the expert's independent work and research.  *See Daubert v. Merrell Dow Pharm., Inc.,* 43 F.3d 1311, 1317 (9th Cir. 1995) (following remand from the Supreme Court).  Under Rule 702, what matters most is that any relevant evidence within the scope of Rule 702 "must be the 'product of reliable principles and methods' and must have been 'reliably applied' in the case."  *United States v. Gissantaner*, 990 F.3d 457, 463 (6th Cir. 2021).

29

### I.B.1. Defendant's Motion to Exclude

Consistent with its scorched-earth litigation strategy, Defendant challenges both Stockton's qualifications and his methodology.  Additionally, it makes a threshold argument that Plaintiff's proffered expert opinions are not helpful.

### I.B.1.a. Helpfulness

Defendant argues that Stockton's opinions are not helpful under Rule 702 because they do not speak to liability—more specifically, to Defendant's particular theory it uses to defend against liability.  (ECF No. 122, PageID #3140, 3142; ECF No. 132, PageID #3465; ECF No. 121, PageID #3113; ECF No. 133, PageID #3486.) Defendant's framing of this helpfulness argument suffers from a fatal flaw.  Although Rule 23 requires evidentiary proof that may go to the merits, consideration of the merits at this stage is limited to that necessary to decide the propriety of class certification.  That is not how Defendant argues this point.  Instead, Defendant attempts to take a *third* bite at the merits apple.  Defendant failed to persuade the Court that its interpretation of the insurance contract at issue was correct on a motion to dismiss and again on a motion for judgment on the pleadings on what amounted to a motion for reconsideration after re-assignment of the case.

But a motion under Rule 702 does not substitute for summary judgment.  *See General Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997).  Indeed, if class certification is appropriate under Rule 23 and if Defendant's position on the merits is correct as a matter of law and Defendant can otherwise carry its burden on a motion for summary judgment, then entry of judgment in its favor would bind all class members who do not opt out.  Arguing the merits now is premature.

Procedurally, as discussed above, the question of helpfulness at this stage relates not to trial on the merits but to "the task at hand," which remains focused on whether Plaintiff can show that a single adjudication satisfies the due-process and other prudential requirements embodied in Rule 23.  Indeed, at trial, the jury will not receive evidence about, for example, whether Plaintiff can use the methodologies Stockton describes and employs to drive class-wide resolution of liability or other issues.  Those determinations are for the Court and are ripe now.  For these reasons, Defendant fundamentally misses the mark with its attempt to short-circuit the *Daubert* analysis that its motion to exclude invited.

### I.B.1.b. Stockton's Opinions on Dealer Fees

Because Ohio's statutory cap for dealer fees is $250, many times the title and license fees at issue, Defendant focuses on Stockton's opinions about them. Defendant attacks the methodology supporting Stockton's opinions regarding dealer fees (ECF No. 122, PageID #3141; ECF No. 121, PageID #3113) and his qualifications to give them (ECF No. 122., PageID #3151; ECF No. 121, PageID #3124).  Specifically, Defendant targets the survey Stockton conducted to determine the dealer fees charged.  (*See* ECF No. 96-3, ¶¶ 32, 33, PageID #1748–49; ECF No. 105-3, ¶¶ 32, 33, PageID #2418–19.)

At the outset, to avoid Rule 702's inquiry into Stockton's methods, Defendant relies on *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455 (2016), to maintain that "Plaintiff has not shown that Stockton's propensity analysis is a permissible method of proving classwide liability by showing that each class member could have relied on that sample to establish liability if he or she had brought an individual action."  (ECF

31

No. 122, PageID #3145; ECF No. 121, PageID #3118.)  But in *Tyson Foods*, the Supreme Court declined to announce a broad rule against the use of representative evidence.  577 U.S. at 454–55.  Instead, the focus remains on the methodology of the survey or sample at issue—not, as Defendant maintains, on whether a party may use such evidence to prove an element of its claims or defenses.  *Id.*  Accordingly, the Court turns to Defendant's arguments regarding Stockton's qualifications and methodology.

### I.B.1.b.i. Qualifications

In its fifth (or possibly sixth depending on how one counts) argument, Defendant maintains that Stockton and his team are not qualified to design or conduct the survey underpinning Plaintiff's opinions regarding dealer fees.  (ECF No. 122, PageID #3152; ECF No. 121, PageID #3125.)  To support this position, Defendant cites the Federal Judicial Center's Reference Manual on Scientific Evidence for the proposition that "[s]urvey design and implementation is its own specialty with specific qualifications."  (*Id.*)  Beyond that, Defendant simply recites the academic credentials of Stockton and certain others who assisted in the survey.  (ECF No. 122, PageID #3152–53; ECF No. 121, PageID #3125–26.)  To be sure, some survey evidence requires highly specialized credentials and qualifications in the social sciences as a threshold to reliability.  On the record presented, this is not such a case.  The Court finds that the verifiable nature of the survey's target (documentary fees that car dealers charge) and the businesses and market at issue do not require the social science credentials that Defendant demands.  Further, based on Stockton's

qualifications and experience in the broader automotive sector, the Court finds that he has sufficient qualifications under Rule 702 to offer opinions on dealer fees.

### I.B.1.b.ii. Methodology and Its Application

Defendant's methodological challenges boil down to whether Stockton improperly focuses on what dealers say they charge by way of document fees, not what consumers actually pay. (ECF No. 122, PageID #3141; ECF No. 121, PageID #3114.) These arguments suffer from several flaws on the facts and circumstances of this case.

Although Defendant points out that Stockton limited his analysis to dealer fees paid in 2021, the class period extends across many years. (*See, e.g.*, ECF No. 122., PageID #3146; ECF No. 121, PageID #3120.) But the cap on dealer fees under Ohio law did not change over the course of the class period, and Stockton based his opinion on information from dates throughout the class period. (*See* ECF No. 127-1, PageID #3309–41; ECF No. 126-1, PageID #3227–69.) For this reason, this opinion reasonably and reliably applies throughout the class period.

Defendant questions the design of the survey that factors into Stockton's opinion on dealer fees. (ECF No. 122, PageID #3149: ECF No. 121, PageID #3122.) Again, this argument rests on the Reference Manual on Scientific Evidence and tries to apply more stringent requirements from the social sciences to the different factual context this case presents. Indeed, the cases on which Defendant relies do not involve analogous circumstances. In each, *counsel* designed or executed the survey. In one, attorneys coaxed class members through a survey conducted to determine damages in a wage-and-hour class action. *Hurt v. Commerce Energy, Inc.*, No. 1:12-cv-758,

2015 WL 410703, at *4 (N.D. Ohio 2015).  In the other, defense counsel designed the survey and admitted that the experts did not conduct a scientifically valid survey. *Yapp v. Union Pac. R.R. Co.*, 301 F. Supp. 3d 1030, 1037 (E.D. Mo. 2004).  Here, even Defendant makes no argument that the record in any way resembles the flaws in the surveys in those cases.  Defendant's criticism comes down to a complaint that Stockton did not personally conduct the survey, delegating tasks to others.  (ECF No. 122, PageID #3150; ECF No. 121, PageID #3123.)  Such a complaint ignores the reality of how experts (to say nothing of lawyers) practice and borders on frivolous.

Other challenges Defendant makes involve Stockton's use of industry publications and data (ECF No. 122, PageID #3153; ECF No. 121, PageID #3126) of a type on which experts in the field reasonably rely, Fed. Evid. R. 703.  Defendant also argues that Stockton engaged in a non-random, skewed sampling of dealers, giving undue weight to high-volume sellers.  (ECF No. 132, PageID #3472: ECF No. 133, PageID #3493.)  At class certification, this methodology—even if Defendant correctly characterizes it, which the Court doubts—goes to questions of commonality and predominance, not reliability.  Defendant also maintains that Stockton's focus on what dealers charge overlooks individual negotiations that might result in payment of less than the statutory maximum dealer fee or even no fee.  (ECF No. 122, PageID #3155; ECF No. 121, PageID #3128.)  But Stockton accounted for this eventuality in formulating his opinion, and Defendant cross-examined him about it and his experience on which his opinions on the subject rest.  (ECF No. 127-1, PageID #3293–96, 3300–01: ECF No. 126-1, PageID #3211–14, 3218–19.)  Nor do the flaws to

which Defendant points cumulatively render unreliable Stockton's opinions on dealer fees.  (ECF No. 132, PageID #3469; ECF No 133, PageID #3490.)   In the end, Stockton's opinions on dealer fees have a sufficiently reliable foundation under Rule 702.

### I.B.1.c. Stockton's Opinions on Title and License Fees

Defendant challenges Stockton's failure to test Geico's data to generate common proof on whether class members paid title and license fees.  (ECF No. 122, PageID #3141, 3157; ECF No. 121, PageID #3118, 3130.)  Stockton opines that "it would be possible to form reasonable estimates of title/license fees already paid by GEICO."  (ECF No. 96-3, ¶ 45, PageID #1754; ECF No. 105-3, ¶ 45, PageID #2415.) The parties fight about who bears the burden of proof on this issue, but the Court need not resolve that dispute to determine the reliability of Stockton's opinions on license and title fees.

Rule 702 requires the reliable application of a reliable methodology to the facts of the case.  Fed. R. Evid. 702(d); *Gissantaner*, 990 F.3d at 463.  He did not do so.  The record reflects that Plaintiff has had the underlying data for a considerable period of time.  Moreover, the court in *Signor v. Safeco Insurance Co. of Illinois*, No. 19-61937, 2021 WL 1348414, at *9 (S.D. Fla. Feb. 18, 2021), faulted Stockton for failing to test a similar methodology in a similar case.  Although Stockton produced his report in this case some two months after that criticism, he did not test his proposed method for identifying from Geico's data whether the company already paid title or license fees to any individual class member.  Plaintiff concedes that the method proposed for

identifying title and license fees paid is testable.  (ECF No. 127, PageID #3272 n.4;

ECF No. 126, PageID #3190 n.4.)

Stockton's failure to test that data renders his proposed method nothing more than a guess—an educated guess, but one bought and paid for.  With respect to title and license fees, Stockton's opinions are untested and, therefore, unreliable.

*   *   *

Ultimately, Defendant seeks to exclude Stockton's opinions because it does not like their substance.  Indeed, the sheer number of Defendant's arguments regarding Plaintiff's expert evidence on dealer fees undercuts whatever (little) merit any one of them might have.  Whether Stockton's opinions provide sufficient proof for Plaintiff to satisfy the requirements of Rule 23 presents a different question (discussed below).  But Stockton's opinions regarding dealer fees have a sufficient foundation and result from a reliable methodology that he applies reliably to the facts of the case, even if he did not reliably apply his proposed methodology to his opinions about license and title fees.

### I.B.2. Tomlin's Opinions

Tomlin is an economist and Senior Managing Director at Ankura Consulting.  He holds a B.A. and M.A. in economics and has published over twenty articles on law and economics, many of which focus on the appropriate calculation of economic damages in the class-certification context.  It is safe to say that Tomlin is qualified to assess the economic dimensions of this case and opine about the calculations regarding title, license, and dealers' fees in the class-certification context.

Tomlin proffers four opinions regarding those of Stockton's on which Defendant's motion to exclude relies. Tomlin opines that: (1) contrary to Stockton's opinion actual cash value can be measured in "multiple alternative ways" and cannot be determined on a class-wide basis; (2) Stockton's calculation of damages for dealer fees cannot be calculated on a class-wide basis and is unreliable because the survey he uses does not follow standard procedures; (3) Stockton's opinion on interest due of fees owed is unreliable because he does not explain specifically how to calculate them under Ohio law; and (4) Stockton is wrong that he can search Geico's database to locate fees actually paid by Geico. (ECF No. 96-3, ¶ 7, PageID #1803–04; ECF No. 105-3, ¶ 7, PageID #2473–74.) The Court address the admissibility of each in turn.

### I.B.2.a. Replacement Costs

For the sake of his analysis, Tomlin assumes that the replacement cost of a vehicle includes title, license, and dealer fees. (ECF No. 96-3, ¶ 21, PageID #1809; ECF No. 105-3, ¶ 21, PageID #2479.) In his opinion, there are multiple ways to measure a car's actual cash value using commonly accepted used vehicle valuation guides. (ECF No. 96-3, ¶¶ 23, 29–39, PageID #1810, #1812–17; ECF No. 105-3, ¶¶ 23, 29–39, PageID #2480. 2482–87.) He goes on to illustrate different valuations of Dr. Desai's vehicle using these various sources. (ECF No. 96-3, ¶ 41, PageID #1818–19; ECF No. 105-3, ¶ 41, PageID #2488–89.) In Tomlin's opinion, using alternative valuation guides to determine actual cash value involves a time-intensive and individualized process. (ECF No. 96-3, ¶ 42, PageID #1819; ECF No. 105-3, ¶ 42, PageID #2489.) Tomlin sampled one hundred randomly selected claims using

37

different valuations and determined that "at least 71% of the putative class members . . . were paid an amount greater than [the value of] their vehicle after adding license, title, and dealer fees to the value." (ECF No. 96-3, ¶ 57, PageID #1827; ECF No. 105-3, ¶ 57, PageID #2497; *see also* ECF No. 96-3, ¶¶ 49–56, PageID #1822–27; ECF No. 105-3, ¶¶ 49–56, PageID #2492–97.)  Based on its review, the Court finds that Tomlin's opinions on replacement cost employ a reliable methodology, which he reliably applies, and that he is qualified to render them.

### I.B.2.b. Dealer Fees

Tomlin offers two opinions regarding dealer fees:  (1) determining which putative class members are owed dealer fees would require the Court to conduct an individual analysis of each claim, and (2) Stockton's opinion is unreliable.  (ECF No. 96-3, ¶ 62, PageID #1830; *id.*, ¶ 95, PageID #1842; ECF No. 105-3, ¶62, PageID #2500; *id.*, ¶ 95, PageID #2512.)  To the extent Tomlin seeks to opine on the reliability of Stockton's opinions, the Court strikes that opinion.  Although Tomlin is qualified to refute the data and methodologies Stockton uses, any opinion regarding the reliability of Stockton's methodology or their application invades the province of the Court under Rule 702.  *Cf. Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985) (recognizing that an opinion offering a legal conclusion "invades the province of the court to determine the applicable law").

*Propensity to Purchase from a Dealer*.  Tomlin's opinion that only 60% of vehicle purchasers purchase from a dealership is reliable because it rests on the same sources as Stockton in addition to a peer-reviewed article by the Rand Journal of Economics. (ECF No. 96-3, ¶ 72, PageID #1833; ECF No. 105-3, ¶ 72, PageID #2503.)

38

*Negotiation of Dealer Fees.*  Tomlin's opinion that consumers can negotiate dealer fees is also reliable.  He opines that whether and in what amount dealers charge fees varies throughout the state of Ohio.  Tomlin cites Consumer Reports, the Cleveland Plain Dealer, and an industry professional to conclude that consumers often negotiate dealer fees before closing a vehicle purchase.  (ECF No. 96-3, ¶¶ 77–79, PageID #1835–36; ECF No. 105-3, ¶¶ 77–79, PageID #2505–06.)

### I.B.2.c. Calculating Interest

Tomlin offers opinions regarding the methodology for calculating interest on any amounts due and owing under Geico's policies to putative class members.  (ECF No. 96-3, ¶¶ 99–101, PageID #1843–44; ECF No. 105-3, ¶¶ 99–101, PageID #2513–14.)  These opinions involve issues bound up with interpretation and application of Section 1343.03 of the Ohio Revised Code.  These legal matters fall outside his expertise.  *See Indiana Ins. Co. v. General Elec. Co.*, 326 F. Supp. 2d 844, 847 (N.D. Ohio 2004) (quotation omitted).  Accordingly, the Court strikes Tomlin's opinions on them as well.

### I.B.2.d. Searching Geico's Data

Tomlin offers opinions about Stockton's proposal to search Geico's data to identify putative class members to whom Geico paid title and license fees.  (ECF No. 96-3, ¶¶ 96–98, PageID #1842–43; ECF No. 105-3, ¶¶ 96–98, PageID #2512–13).  In this opinion, Tomlin does nothing more than read the record, which does not help the Court.  Moreover, Tomlin is an economist without any stated familiarity with Geico's data systems and electronically stored information.  Therefore, the Court strikes this opinion.

*     *     *

The Court **STRIKES** Tomlin's opinions that make impermissible legal conclusions or invade the province of the Court (ECF No. 96-3, ¶ 92, PageID #1841; ECF No. 105-3, ¶ 92, PageID #2511) or are outside his expertise (ECF No. 96-3, ¶¶ 96–98, 99–101, PageID # 1842–43, 1843–44; ECF No. 105-3, ¶¶ 96–98, 99–101, PageID #2512–13, 2513–14).    However, Tomlin's opinions regarding vehicle replacement costs, the percentage of consumers likely to purchase from a dealer, and individual negotiation of dealer fees rest on sufficient facts and reliable methodologies within Tomlin's expertise.

## II.    Motion for Class Certification

Plaintiff seeks class certification under both Rule 23(b)(2), with respect to his declaratory judgment claim, and Rule 23(b)(3), on his breach-of-contract count. Because the latter drives the litigation, at least in a monetary sense, the Court begins its analysis there.

### II.A.   Rule 23(b)(3)

Rather than discuss each requirement under Rule 23, Plaintiff's motion, like many of its kind, turns on predominance and superiority.   Therefore, the Court directs its attention to those issues.   To certify a class, Rule 23(b)(3) requires the Court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."   In making these findings, the following matters are pertinent:   (A) the interests of class members in individually controlling the litigation; (B) the extent

and nature of any litigation concerning the dispute class members have already initiated; (C) the desirability of concentrating litigation of the claims in the particular forum; and (D) the likely difficulties in managing the class action.  Fed. R. Civ. P. 23(b)(3).

### II.A.1. Predominance

Predominance "tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  "To meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 544 (6th Cir. 2012) (quotation omitted).  In establishing predominance, "[a] plaintiff class need not prove that each element of a claim can be established by classwide proof." *Glazer v. Whirlpool Corp. (In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.)*, 722 F.3d 838, 858 (6th Cir. 2013) (citing *Amgen*, 568 U.S. at 468).  Where predominance is satisfied, if a plaintiff cannot prove at trial a common question that predominates over individual issues, the claim will fail on the merits as to the entire class.  *Id.*

Further, "the fact that a defense may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones." *Young*, 693 F.3d at 544 (citing *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007)).  Although individual damages calculations will generally not defeat proof of predominance, *Olden v. Lafarge Corp.*, 383 F.3d 495, 508–09 (6th Cir. 2004), Rule 23 still requires a damages model that functions on a

class-wide basis, *Rodney v. Northwest Airlines, Inc.*, 146 F. App'x 783, 791 (6th Cir. 2005) (citing *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 303 (5th Cir. 2003)).  In this way, the predominance inquiry "prevents the class from degenerating into a series of individual trials." *Taylor v. CSX Transp., Inc.*, 264 F.R.D. 281, 294 (N.D. Ohio 2007).

To the extent predominance depends on the presence of common questions of fact or law, Plaintiff likely satisfies this element of Rule 23(a)(2)—at least with respect to his contract claim—based on interpretation of the policy language at issue and the requirements of Ohio law for proving or defending against liability based on that language.  Even though answering those (and other) common questions will drive resolution of common issues on Plaintiff's breach of contract claim, the Court finds that those answers do not predominate over the questions affecting individual class members.

### II.A.1.a. Dealer Fees

Contrary to Defendant's argument, the Court need not resolve disputed issues of fact to making a finding on predominance.  Defendant relies on the testimony of a Geico employee that, in some cases, it might pay dealer fees.  (ECF No. 118, PageID #3091; ECF No. 117, PageID #3062.)  But this testimony, on its face, is not persuasive.  Although the deponent left some (very small) amount of wiggle room regarding whether Geico *ever* paid a dealer fee because of its individualized process for settling claims (ECF No. 116-3, PageID #3029: ECF No. 115-3, PageID #2921), in context, this testimony follows two pages of questions and answers confirming that Geico did not pay dealer fees (ECF No. 116-3., PageID #3027–29: ECF No. 115-3, PageID

42

#2919–21).   Even the testimony on which Defendant relies does not support its position:   "Typically, we would not, as a matter of course, add a dealer fee to [the] value of a loss of a vehicle."  (ECF No. 116-3, PageID #3029: ECF No. 115-3, PageID #2921.)

Similarly, Defendant relies on Tomlin's opinion that "[d]etermining whether a particular putative class member would be more likely to purchase from a dealer or a private party requires examining the specifics of that individual putative class member."  (ECF No. 118, PageID #3092 (citing ECF No. 96-3, ¶ 62, PageID #1830); ECF No. 117, PageID #3063 (citing ECF No. 105-3, ¶ 62, PageID #2500.)  On this point, however, Tomlin advances a bare opinion unsupported with any evidence or information.  Where he does support his opinions on the subject, Tomlin relies on articles publicly available online (ECF No. 96-3, ¶ 16, PageID #1807 n.28; ECF No. 105-3, ¶ 16, PageID #2477 n.28)—a methodology that offers little more than counsel's arguments.

But Defendant does not bear the burden of defeating predominance.  Instead, Plaintiff must prove that common questions capable of driving class-wide resolution predominate over individual issues.  On this score, the record shows that Plaintiff has not carried his burden and cannot do so.  At bottom, Plaintiff relies on the use of Stockton's model to establish liability based on common evidence on a class-wide basis.  (ECF No. 97, PageID #2144–45; ECF No. 105, PageID #2314–15.)  In his report, Stockton estimates the propensity of Geico policyholders who claimed a total loss to purchase replacement vehicles from dealerships.  (ECF No. 96-3, ¶ 38, PageID

#1751; ECF No. 105-3, ¶ 38, PageID #2421.)  In his opinion, assuming such putative class members replace their vehicles with cars of comparable ages (a questionable assumption), 59.86% of those in Geico's data files had such a propensity (*id*.), meaning that they likely incurred dealer fees.  Based on Stockton's opinions, Plaintiff argues that he can prove "that the propensity of all Class members with total loss vehicles less than 9 years old to buy from a dealer exceeds 50% and collectively is 74.15%, and that the propensity of Class members as a whole to purchase from a dealer is 59.86%." (ECF No. 97, PageID #2136; ECF No. 105, PageID #2307.)

This evidence defeats a finding of predominance.  Interpreting this proof most favorably to Plaintiff, even assuming that virtually all dealer sales in Ohio incur a dealer fee (a reasonable assumption in the face of Section 4517.261 of the Ohio Revised Code), he still cannot show that just over a quarter of the putative class do not purchase from a dealer.  In the Court's view, this evidence alone establishes that individual issues regarding payment of dealer fees predominate over common questions.  Moreover, the record shows that dealerships often individually negotiate their fees.  (ECF No. 96-3, ¶¶ 64, 76–80, PageID #1830–31, 1835–37; ECF No. 105-3, ¶¶ 64, 76–80, PageID #2500–01, 2505–07.)   In addition, the record on class certification shows that Defendant individually negotiates and settles each claim based on its particular facts and circumstances.  (*See, e.g.*, ECF No. 116-1, ¶¶ 6, 7, PageID #3017; ECF No. 115-1, ¶¶ 6, 7, PageID #2909.)  These additional facts in the class certification record demonstrate that individual issues, not common questions, will drive resolution of this litigation.

### II.A.1.b. Title and License Fees

For this same reason, the Court finds that individual issues predominate over common questions with respect to title and license fees as well. Defendant "paid only title and not license fees on a reimbursement basis" before the late summer of 2020. (ECF No. 97, PageID #2133; ECF No. 105, PageID #2304; *see also* ECF No. 96-4, PageID #1870; ECF No. 105-4, PageID #2540.) Without reliable evidence that Plaintiff can account for payment of title and license fees in individual cases in a common proceeding, Plaintiff has failed to carry his burden of establishing predominance with respect to these fees as part of his breach of contract claim.

### II.A.1.c. Predominance Findings

In the end, the proof on Plaintiff's motion for class certification shows that Defendant employs claim-by-claim adjustment practices. Under Defendant's practices, some number of class members have received full compensation for the amounts at issue, including the dealer, license, and title fees Plaintiff seeks on behalf of the class. Indeed, Geico paid Dr. Desai the title fee. Accounting for such class members presents no small task. In some cases where courts have certified a class, like those on which Plaintiff relies, that task might not defeat predominance. But here, it does.

Based on the record before the Court on class certification, a common proceeding to resolve the claims of all putative class members will leave considerably more work to do on an individual basis to establish liability to any particular class member. In short, some common questions apply to large numbers of putative class members. But the record demonstrates that those common questions do not

45

predominate over the individual issues needed to drive resolution of this dispute, and the Court so finds.

Plaintiff argues that the common questions regarding interpretation of the policy and Geico's obligations under it predominate over any individual issues.  (ECF No. 138, PageID #3562; ECF No. 137, PageID #3540.)  With respect to money damages relating to the fees at issue, the Court finds that those common questions recede and that individual issues predominate in the face of Defendant's practices for adjusting and settling total-loss claims.  In this respect, this record distinguishes this case from those on which Plaintiff relies.

For example, in *Hicks v. State Farm Fire & Casualty Co.*, No. 14-CV-00053, 2019 WL 846044 (E.D. Ky. Feb. 21, 2019), a case on which Plaintiff relies heavily, the plaintiffs filed a putative class action in Kentucky against their insurer over the method by which the defendant calculated the actual cash value of structural losses it insured.  At bottom, on behalf of themselves and a class, the plaintiffs asserted contract and statutory claims based on the insurer's calculations of depreciated labor costs when determining payments for actual cash value.  In certifying a class, the district court concluded that determining whether the defendant's standard process of depreciating labor costs violated the insurance policy was "a central issue to each plaintiff's claims and subject to generalized proof."  *Id.* at *5.  In contrast, this case involves individualized questions that require adjudication before a finding of liability beyond the common central issue that the court found predominated in *Hicks*.  Indeed, the *Hicks* Court noted that, where "numerous inquiries are required

to determine whether a breach of the contract occurred as to each class member," those individualized determinations predominate over common questions involved interpretation of a standard form contract. *Id.* (citing McLaughlin on Class Actions § 5:56 (12th ed., updated Dec. 2015)).

On appeal, the Sixth Circuit affirmed class certification. *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 455 (6th Cir. 2020). Plaintiff argues that *Hicks* forecloses a finding on predominance adverse to class certification. (ECF No. 138, PageID #3551 & #3562; ECF No. 137, PageID #3529 & #3540.) This argument overlooks the different policy language and practices at issue in a different market. Further, a ruling that certifying a class was not an abuse of discretion does not require the same result in all circumstances or imply that denying class certification constitutes an abuse of discretion, even on the same record. Here, the record differs materially from the one in *Hicks* such that common questions do not predominate.

Similarly, Plaintiff's reliance on *Young v. Nationwide Mutual Insurance Co.*, 693 F.3d 532 (6th Cir. 2012), is also misplaced. There, the Sixth Circuit affirmed the certification of ten subclasses for claims arising out of insurance-premium tax disputes in Kentucky. The plaintiffs sued their insurers for incorrectly charging them for local taxes as a result of the defendants' failure to identify correctly the taxing jurisdiction in which the plaintiffs' respective policies were located. *Id.* The Sixth Circuit agreed that the common issue of causation predominated because the plaintiffs' alleged injuries depended on whether the insurers failed to employ the correct location-verification process, which used geocoding software to discern the

47

location of the class members' respective policies.  *Id.* at 544–45.  Both this case and *Young* involve the question of an insurance company's liability under a policy.  But that is as far the similarities go.  Unlike *Young*, the record shows that Defendant, though it uses CCC One to determine a starting valuation, does not employ a uniform process for determining the actual cash value of a total loss that lends itself to resolution on a class-wide basis.

Finally, *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 566 (6th Cir. 2007), is also distinguishable.  In *Beattie*, the plaintiff alleged that a telephone company violated federal law by using deceptive billing practices to charge plaintiffs for a wire-maintenance program.  Affirming class certification, the Sixth Circuit held that common issues predominated because the defendant's liability to all class members turned on whether it violated the applicable federal statute, not whether any individual customer requested the wire-maintenance program.  *Id.* at 566.  Here, in contrast, an interpretation of the policy in Plaintiff's favor will not yield a common, class-wide liability finding without determination of numerous additional, individualized issues.

Nor does *Angell v. GEICO Advantage Ins. Co.*, No. 4:20-cv-799, 2021 WL 5585732 (S.D. Tex. Nov. 30, 2021), persuade the Court that class certification is appropriate in this case.  *Angell* involves claims similar to those advanced here, but fails to identify the relevant policy language.  The court dismissed Geico's arguments on predominance as going to damages.  *Id.*  But the court's predominance analysis is

48

fairly cursory, *id.*, and the record in this case shows that the individual issues that predominate go to liability, not just damages.

In short, in each of the cases on which Plaintiff relies, common claims-handling practices left questions of the parties' respective rights and obligations under a contract and interpretation of policy language to predominate. The record here does not support a similar finding.

### II.A.2. Superiority

"The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Young*, 693 F.3d at 545 (quoting *Amchem Prods.*, 521 U.S. at 617 (citation omitted)). Without a class action, then, "[w]here it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress." *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980). Without question, the fees at issue present a textbook example for a class action in this regard.

But the superiority inquiry advances other goals as well. Courts consider, for example, "the difficulties likely to be encountered in the management of a class action." *Beattie*, 511 F.3d at 567. "Where many individual inquiries are necessary, a class action is not a superior form of adjudication." *Young*, 693 F.3d at 545. Superiority also asks whether class adjudications will "achieve economies of time, effort, and expense." *Amchem Prods.*, 521 U.S. at 615.

49

Defendant makes no argument regarding superiority.  (ECF No. 118, PageID #3096–97: ECF No. 117, PageID #3066–67.)   For his part, Plaintiff "does not anticipate any manageability problems."  (ECF No. 97, PageID #2150; ECF No. 105, PageID #2321.)  The Court is not so sanguine.  Stockton did not test his proposed methodology for identifying from Geico's data individual policyholders who already received payment of title and license fees under their policies.  Nor did he evaluate the amount of effort that would be involved in that undertaking.

Put another way, construing the record in Plaintiff's favor, the Court finds that the individual issues involved in determining whether Defendant paid the fees as part of the actual settlement amount—no matter what method is used to determine that—involves considerable time, effort, and expense that outweighs the efficiencies, if any, in class certification.  With respect to the discrete item of title fees (actually, as a reminder, a claim for interest on title fees), resolving the claim hardly justifies the transaction costs in determining any amount Defendant might owe.  That is, recovery of pennies or a few dollars for individual class members does not justify the time, effort, and resources the Court and the parties would devote to the endeavor.  In the end, Stockton's dealer-fee model, though reliable, depends on predictions.  And Plaintiff concedes that those predictions and the statistical evidence on which the model relies "may not offer certainty as to any individual Class member's likelihood of purchasing from a dealer."  (ECF No. 138, PageID #3560: ECF No. 137, PageID #3538.)  Accordingly, a common proceeding will not ultimately advance the resolution of the claims on a class-wide basis in an efficient or meaningful way.  The Court finds

that a class action does not represent the superior method for adjudicating the controversy.

## II.B.  Rule 23(b)(2)

Plaintiff moves for certification of a class under Rule 23(b)(2) on his declaratory judgment claim. Under this rule, a plaintiff may maintain a class action if the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Certification of this sort of class action depends on "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). Put another way, Rule 23(b)(2) only permits certification where a single declaratory judgment will apply to every class member. *Id*. This is so because of the indivisible nature of declaratory relief at issue, which will apply to all class members or none of them. *Id*.

### II.B.1. The Propriety of Certification Under Rule 23(b)(2)

Two features of Rule 23(b)(2) make certification of a class here improper. First, according to the Supreme Court, Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Dukes*, 564 U.S. at 360–61. "[I]ndividualized monetary claims belong in Rule 23(b)(3)." *Id*. at 362. Second, the Supreme Court held that Rule 23(b)(2) does not permit class certification where "the monetary relief is not incidental to the

51

injunctive or declaratory relief." *Id.* at 360.  In his declaratory judgment cause of action, Plaintiff seeks "supplemental relief and attorneys' fees" (ECF No. 1-1, ¶¶ 56, 63, 66, PageID #33–35; *see also* ECF No. 138, PageID #3554; ECF No. 137, PageID #3532), a position counsel reiterated at oral argument.  This request gives away the game.  While a declaration interpreting the policy provisions at issue will apply to all class members, Plaintiff actually seeks monetary relief through this count (or a determination or re-determination of amounts class members might be owed under the policy).  That supplemental relief is not incidental to the declaratory judgment sought, it is the whole point of the cause of action here.  Moreover, any relief to which a policyholder might be entitled would depend on individualized determinations based on his or her particular circumstances.  Accordingly, *Wal-Mart v. Dukes* forecloses certification of class under Rule 23(b)(2) here.

A further textual basis supports this determination.  Rule 23(b)(2) permits class certification where "final injunctive relief or *corresponding* declaratory relief" applies to the class as a whole.  Fed. R. Civ. P. 23(b)(2) (emphasis added).  On the face of the rule, class certification of a claim for declaratory relief generally requires a corresponding request for an injunction, not a freestanding cause of action.  This reading of the text is consistent with the history of Rule 23(b)(2), which arose from cases involving civil rights.  *See Dukes*, 568 U.S. at 361 (summarizing historical origins of the rule).  To be sure, Rule 23(b)(2) does not exclusively apply to civil-rights claims.  *Amchem Prods.*, 521 U.S. at 614 (quoting Benjamin Kaplan, *Continuing Work of the Civil Committee:  1966 Amendments of the Federal Rules of Civil Procedure (I)*,

81 Harv. L. Rev. 356, 389 (1967)). But the text of the rule suggests that the declaration that allows maintenance of a class action requires a claim for injunctive relief or the issuance of a declaration as a subsidiary or related remedy. Such is not the case here.

### II.B.2. Sixth Circuit Precedent

To resist this outcome, Plaintiff relies on *Gooch v. Life Investors Insurance Co.*, 672 F.3d 402 (6th Cir. 2012). At the outset, the court's discussion in *Gooch* of the class-certification issues that apply to this case is *obiter dicta*. There, the insurance dispute at issue had a lengthy and complicated procedural history. In addition to the tortured proceedings in the district court and a prior interlocutory appeal, a State court settlement overlapped with the class certified in the district court, which also issued a preliminary injunction ordering the insurance company to pay the plaintiff according to past practices before a policy change that gave rise to the litigation. On appeal, the Sixth Circuit vacated class certification, holding that the settlement in State court "preclude[d] the claims of most class members." *Id.* at 417. Nevertheless, and understandably based on the tangled proceedings in the district court, the court went on to address several arguments the insurance company raised "in aid of further proceedings." *Id.*

As relevant to Plaintiff's arguments for certification of a Rule 23(b)(2) class, *Gooch* has two points that require discussion. First, the defendant in *Gooch* argued that *Wal-Mart v. Dukes* precludes certification because the plaintiff sought money damages. *Gooch* explains that Rule 23(b)(2) and Rule 23(b)(3) provide different avenues for class certification that require separate analysis. 672 F.3d at 428. Put

another way, it is not enough to say that claims for money damages under Rule 23(b)(3) "predominate" over a claim for declaratory relief under Rule 23(b)(2). Here, the Court does not so hold and reaches its determination about class certification under Rule 23(b)(2) on its own terms and separate from its findings about predominance and superiority under Rule 23(b)(3).

Second, *Gooch* "specifically approved certifying a declaratory judgment claim under (b)(2)" separate from certification under Rule 23(b)(3).  (ECF No. 97, PageID #2143; ECF No. 105, PageID #2314.)  Indeed, *Gooch* advised that "the declaratory judgment will apply to a uniform interpretation of a contract that governs or governed each class member, making Rule 23(b)(2) certification appropriate."  672 F.3d at 428. What matters, according to *Gooch*, is not a common grievance but a ground for relief applicable to the entire class.  *Id.* (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1775 (2d ed. 1996)).  Without question, interpreting the policy at issue presents a common question that applies to each class member.  But, as stated above,  Rule 23(b)(2) requires more, which is not present here.  *Gooch* does not provide to the contrary, persuasively or otherwise.

Subsequently, the Sixth Circuit revisited these issues in a class action involving plan interpretation under the Employee Retirement Income Security Act of 1974.  In *Clemons v. Norton Healthcare Inc.*, 890 F.3d 254, 279 (6th Cir. 2018), the Sixth Circuit read *Wal-Mart v. Dukes* as holding open the possibility that certification under Rule 23(b)(2) might be appropriate where money damages are incidental to declaratory relief.  *Clemons* reiterated that certification under Rule 23(b)(2) "remains

available when the plaintiffs seek a declaration about the meaning of a contract even when the declaratory relief serves as a predicate for later monetary relief." 890 F.3d at 279 (quoting *Gooch*, 672 F.3d at 427, 429) (cleaned up).  Because the ERISA plan at issue "must mean the same thing regardless of the person to whom it applies, 'uniform declaratory relief is appropriate.'" *Id.* at 280 (quoting *Gooch*, 672 F.3d at 428).  But separate certification under Rule 23(b)(3) is necessary for determining damages.  *Id.* at 279.  This approach reinforces the Court's determination that certification under Rule 23(b)(2) is not appropriate here.

In the end, Plaintiff argues that, based on *Gooch*, "Rule 23(b)(2) certification remains available in other circumstances, including when the plaintiffs seek a declaration about the meaning of a contract." 672 F.3d at 427.  Fair enough.  But in *Dukes*, the Supreme Court recognized that certification under Rule 23(b)(2) is not appropriate where "monetary relief is not incidental to the injunctive or declaratory relief." 564 U.S. at 360.  Such is the case here, where Plaintiff seeks further relief, not just a declaration, and the further relief sought drives not just the litigation but the motion for class certification.  If Plaintiff sought *only* a declaration, then his argument based on *Gooch* (and *Clemons*) might have force.  Primarily, however, he seeks relief inconsistent with certification under Rule 23(b)(2).

This same result would obtain even if *Gooch* were controlling precedent with respect to its discussion of Rule 23(b)(2).  In *Gooch*, the court thought certification under Rule 23(b)(2) was appropriate because the insurance company "interprets the [policy language at issue] the same way for each policyholder," making uniform

55

declaratory relief appropriate.  672 F.3d at 428.  For this reason, certification under Rule 23(b)(2) is not appropriate here.  The record shows that Defendant does not interpret or apply the policy language at issue the same way in each total loss. Accordingly, even if *Gooch* were more than persuasive authority, it would be distinguishable on the record before the Court.

## CONCLUSION

For the foregoing reasons, the Court determines that Plaintiff lacks standing to maintain Count III for breach of contract based on title fees and, therefore, **DISMISSES IN PART** Count III, **GRANTS IN PART** Defendant's motion to exclude (ECF No. 122; ECF No. 121), **STRIKES** certain opinions of Defendant's expert, and **DENIES** Plaintiff's motion for class certification (ECF No. 97; ECF No. 105).

**SO ORDERED.**

Dated:  December 6, 2021

_____
J. Philip Calabrese
United States District Judge
Northern District of Ohio